Javier Torres (CA Bar No. 271538)
**STINSON LEONARD STREET LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
javier.torres@stinson.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sacramento Municipal Utility District, Transmission Agency of Northern California and Turlock Irrigation District, <br><br>         Plaintiffs, <br><br> v. <br><br> Federal Energy Regulatory Commission, Cheryl LaFleur, in her capacity as commissioner of FERC; Robert Powelson, in his capacity as commissioner of FERC; and Neil Chatterjee, in his capacity as Chairman of FERC, <br><br>         Defendants. | Civ. No. _____ <br><br> **PETITION FOR REVIEW AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1.      Plaintiffs Sacramento Municipal Utility District (SMUD), Transmission Agency of Northern California (TANC) and Turlock Irrigation District (TID) (collectively, Plaintiffs), bring this petition for review and Complaint for Declaratory and Injunctive Relief against the Federal Energy Regulatory Commission (FERC or Defendant), challenging its September 25, 2017 decision[1] to review under section 7(a) of the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act or Act), [2] rather than the broader review provisions of section 7(k) of that Act, a decision by the Bonneville Power Administration (BPA) that nearly triples the rates for hourly electric transmission service on BPA's "Southern Intertie," a facility "primarily used to export power from the

---

[1] *Bonneville Power Administration*, 160 FERC ¶ 61,113 (2017) (September 25 Order), attached to this Complaint as Exhibit A.

[2] The Northwest Power Act is the common name for the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C.§§ 839 et seq.

Pacific Northwest and Canada to California."[3]  Plaintiffs seek declaratory relief to invalidate FERC's determination regarding the proper statutory review provision and to direct FERC to vacate that portion of its September 25, 2017 order (September 25 Order) granting BPA interim authorization to collect the higher rates for hourly service on its Southern Intertie.[4]

### JURISDICTION

2.     This Court has subject matter jurisdiction over the petition for review under 28 USC 1331. Plaintiffs assert claims in this action arising under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.  See also *Port of Seattle, Wash. v. F.E.R.C.*, 499 F.3d 1016, 1027 (9th Cir. 2007) ("[W]here FERC has made a determination to adjudicate a dispute…, the outcome it chooses is subject to judicial review under the standards of review set forth in the Administrative Procedure Act.").

3.     The final agency action for which Plaintiffs seek review is FERC's determination that its statutorily required review of the Bonneville Power Administration's rates under the Northwest Power Act should apply the narrow review standards set forth in section 7(a) of that Act rather than the broader review required by section 7(k). *Bonneville Power Administration*, 160 FERC ¶ 61,113 (2017). While the Bonneville rates themselves are subject to direct review by the United States Court of Appeal for the Ninth Circuit under section 8 of the Northwest Power Act,[5] the Ninth Circuit has stated that it does not directly review FERC's orders reviewing the Bonneville rates. *Washington Utilities & Transp. Comm'n (WUTC) v. F.E.R.C.*, 26 F.3d 935, 940 (9th Cir. 1994).[6]

4.     Where the statute governing an agency's actions is silent regarding the process for judicial review, no statute expressly precludes judicial review, and the challenged agency action is not "committed to agency discretion by law," i.e., there is "law to apply," review of the agency's action is

---

[3] September 25 Order, n.1.
[4] BPA's filings with FERC also changed various other BPA transmission and power rates. This Complaint does not challenge FERC's order authorizing BPA to charge those changed rates.
[5] 16 U.S.C.§ § 839f(e)(5).
[6] ("under the Northwest Power Act, 'judicial review is of the BPA action—the rate determination—and not FERC's subsequent approval and confirmation of the BPA determination." … "As we have just said, however, review under that statute is confined to the order of the BPA; it does not include review of the actions of FERC.").

proper, 5 U.S.C. § 701(a); 5 U.S.C. § 703 (1994), and is to take place in a federal district court. 28 U.S.C. § 1331 (1994).

5.      That is the case here. The September 25 Order, as noted, was issued under the Northwest Power Act. The statute is otherwise silent on where review of final agency action by FERC is to take place and there is no statutory provision precluding judicial review of FERC's Northwest Power Act determinations. Whether FERC's review of Bonneville's challenged rate orders should take place under section 7(k) rather than section 7(a) of that Act is, by definition, not committed to agency discretion by law. On the contrary, there are specific standards governing the applicability of these provisions[7] and the Plaintiffs' action is a direct challenge to whether FERC properly applied those standards. In such circumstances, the federal district courts have jurisdiction to entertain the petition.

## PARTIES

6.      SMUD is a customer-owned municipal utility district engaged in the generation, distribution, purchase, and sale of electric power to approximately 1.4 million consumers within its boundaries, which encompass most of the County of Sacramento and a small portion of the County of Placer, both in California. It purchases a significant portion of the electricity it uses to serve its customers from suppliers in the Pacific Northwest, including BPA. The Southern Intertie is used to deliver SMUD's purchases from BPA.

7.      TANC a joint exercise of powers agency organized and existing under the laws of the State of California and is a municipality as defined in section 3(7) of the Federal Power Act, 16 U.S.C. § 796(7) (2012). Among TANC's purposes is the provision of electric transmission facilities and services for the use of its Members. Its Members are the California cities of Alameda, Biggs, Gridley, Healdsburg, Lodi, Lompoc, Palo Alto, Redding, Roseville, Santa Clara, and Ukiah; SMUD; the Modesto Irrigation District; and TID. The Plumas-Sierra Rural Electric Cooperative is an associate

---

[7] "FERC conducts its review pursuant to substantive standards set forth in the [Northwest Power Act]." *Southern California Edison Co. v. FERC*, 770 F.2d 779,784 (9th Cir. 1985).

member of TANC. TANC is the largest Participant in, and the Project Manager of, the California-Oregon Transmission Project, a 500 kV transmission project that is interconnected with BPA's Southern Intertie to the north and to transmission lines under the operational control of the California Independent System Operator Corporation to the south. As an owner of transmission interconnected with BPA's Southern Intertie, it has an interest in ensuring that the use of the COTP by TANC Members and others is not adversely impacted and in addressing seams issues that may impact the COTP with other transmission system owners. In addition to the impact on SMUD and TID, the increase in the transmission charges for hourly transmission service on the Southern Intertie authorized by FERC is likely to impact TANC's other Members that purchase electricity originating in the Pacific Northwest from BPA and other energy suppliers that utilize the Southern Intertie.

8.     TID is a customer-owned irrigation district organized under the laws of the State of California (California Water Code §§ 20500-29978). TID supplies electric power and energy to the residents and businesses within its service area. It serves approximately 100,000 electric retail customers. Like SMUD, TID purchases a significant portion of the electricity it uses to serve its customers from suppliers in the Pacific Northwest, including BPA. The Southern Intertie is used to deliver TID's purchases from BPA and TID also purchases transmission service on the Southern Intertie directly from BPA.

9.     Defendant FERC is charged under the Northwest Power Act with reviewing and then confirming or rejecting changes that BPA proposes to make to the rates it charges for various services it provides.

10.     BPA is neither a petitioner nor a respondent in this proceeding. But it sells electricity into California that is purchased by Plaintiffs and utilizes its Southern Intertie facilities to make deliveries of that electricity. The Southern Intertie is also used by other electricity suppliers to deliver power into California.  It is the rates that BPA charges for the transmission of its electricity sales that are subject to review by FERC.

**VENUE**

11.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because the Plaintiffs reside within this district.

**FINALITY, EXHAUSTION OF ADMINISTRATIVE REMEDIES AND RIPENESS**

12.     Judicial review of agency actions under the APA is limited to those agency actions that are final, i.e., those actions that have some direct, binding, and immediate impact on the parties. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140-42 (1967).  Although the September 25 Order is styled as an "Order Approving Rates On an Interim Basis," it is nonetheless a final order regarding the standard of review that FERC has and will exercise over BPA's rates for hourly transmission service on the Southern Intertie. Nothing in the September 25 Order suggests that FERC will revisit its determination that the rates in question should be reviewed under section 7(a) rather than section 7(k) of the Act. Where FERC "did not represent a tentative position on the part of the [agency], the Ninth Circuit has held that the agency's action is final." *Assiniboine and Sioux Tribes v. Bd. of Oil and Gas*, 792 F. 2d 782, 789 (9th Cir.  1986). The United States District Court for the District of Columbia has similarly found that an agency's decision to proceed under section 205 of the Federal Power Act rather than section 206 was a final agency order and reviewable, even though the agency might ultimately approve the company's rates under either standard. *Fla. Power & Light Co. v. FERC*, 617 F. 2d 809, 813-14 (D.C.Cir. 1980). Both the different burdens of proof under the two provisions and the risk that FPL's rates might be subject to refund were sufficient to establish that FPL had been aggrieved by a final agency order. It is not unusual, moreover, that an agency order might be final as to some issues, but not as to others. *See, e.g., West Penn Power Co. v. EPA*, 860 F.2d 581, 587 (3d Cir. 1988).

13.     FERC's September 25 Order makes the BPA transmission rates subject to refund pending a final determination on the filing. September 25 Order, P 13. But this fact does not affect the finality of the order or obviate injury to Plaintiffs. First, the refund protection is illusory. No party has contested that, if section 7(a) is the proper statutory provision for review of BPA's rates for hourly

transmission service on the Southern Intertie – an issue FERC has already decided – those rates should

be affirmed by FERC in a final order. *See* EF17-4, Answer of Sacramento Municipal Utility District,

Transmission Agency of Northern California and Turlock Irrigation District Opposing Bonneville

Power Administration's Motion to File Out-of-Time Answer or, in the Alternative, Motion for Leave

to Respond to Bonneville's Untimely Pleading, filed September 19, 2017; EF17-4, Motion of

Sacramento Municipal Utility District, Transmission Agency of Northern California and Turlock

Irrigation District to Eliminate Comment Period, for Shortened Response Period and for Expedited

Action on Final Order Under EF17-4, filed September 29, 2017, p. 2 ("[Plaintiffs have] not contended

that BPA's Southern Intertie rates fail to collect enough money or that they allocate transmission costs

between federal and non-federal uses inequitably."); *see also* EF17-4 Docket (no comments by any

party arguing that section 7(a) standard is not met). Second, even if there was a plausible prospect that

FERC might ultimately reject these rates under section 7(a), refund relief will not provide rate

protections for the Plaintiffs. With the limited exception of TID, the remaining Plaintiffs do not

directly purchase BPA transmission service. Rather, when SMUD purchases power delivered into

California, the cost of use of BPA's Southern Intertie transmission is reflected in the bundled purchase

price. The same would be true for other TANC Members that do not take BPA transmission service but

that purchase electricity from the Pacific Northwest via arrangements that similarly encompass the cost

of BPA's Southern Intertie hourly rates for power delivered at the California-Oregon Border. Should

FERC order refunds of the BPA hourly rate increase, the refunds would actually go to the third parties

that purchase hourly transmission service, not to the Plaintiffs.

14.     In determining whether to review agency action, the courts will look not only to finality,

but to whether a party has exhausted their administrative remedies and whether the agency's action is

ripe for review. FERC actions under the Federal Power and Natural Gas Acts require would-be

petitioners first to seek rehearing from the agency before they may seek judicial review. See, e.g., 16

U.S.C. § 825*l*.  But a rehearing requirement is not implied, it must be set out in the relevant statute. 5

U.S.C. § 704 (1994). Thus, when FERC is acting under statutes other than the Federal Power and Natural Gas Acts, this rehearing requirement does not apply. *See, e.g., Industrial Cogenerators v. FERC*, 47 F. 3d 1231, 1234 (D.C. Cir. 1995)(holding that judicial review provisions of Federal Power Act do not apply to FERC orders under the Public Utility Regulatory Policies Act); *see also Association of Oil Pipe Lines v. FERC*, 83 F. 3d 1424 (D.C. Cir. 1996) n. 14 (FERC orders issued under the Interstate Commerce Act not subject to rehearing requirement). FERC itself has acknowledged that parties challenging the rules it was required to develop under the Northwest Power Act were not required to request rehearing before seeking judicial review of those rules. *Southern California Edison Co. v. FERC*, 770 F.2d 779, 782 (9th Cir. 1985). Because the September 25 Order likewise arises under the Northwest Power Act, no rehearing requirement applies.

15.     Finally, FERC's September 25 Order is ripe for review. Ripeness is "peculiarly a question of timing," *Regional Rail Reorg. Act Cases*, 419 U.S. 102, 140 (1974), designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). "Review is not premature if the agency action is final, and is 'purely legal.'" *Assiniboine and Sioux Tribes v. Bd. of Oil and Gas*, 792 F. 2d 782, 789 (9th Cir. 1986), citing *Abbott Laboratories*, 387 U.S. at 149. The question in this case is likewise "purely legal," i.e., whether FERC applied the appropriate statutory provision to govern its review of the challenged BPA rates. The standards for ripeness are also met where the effect of the agency's ruling is that "petitioners are immediately subject to higher rates." *Southern California Edison Co. v. FERC*, 770 F.2d 779, 785 (9th Cir. 1985). That is precisely the case here. Plaintiffs acknowledged to FERC that BPA would be entitled to both interim and final approval of its Southern Intertie rates under the narrow scope of review under section 7(a). But section 7(k) obligates FERC to undertake a "much broader review" of the near tripling of the Southern Intertie hourly transmission rates. *California Energy Comm'n v. Johnson*, 767 F. 2d 631, 635 (9th Cir. 1985).

## STATEMENT OF THE FACTS

16.     The Bonneville Power Administration (BPA) is a federal power marketing agency,

authorized by Congress to sell federal power in the Pacific Northwest region and to sell surplus power

outside the Pacific Northwest, primarily to California. *Southern California Edison Co. v. FERC*, 770 F.

2d 779, 781 (9th Cir. 1985).

17.     Responding to increasing demand for inexpensive hydroelectric power generated on the

Columbia River system, in 1980, Congress passed the Northwest Power Act, 16 U.S.C. §§ 839-839h

(1982). *Id.*  Under that Act, only "surplus energy" and "surplus peaking capacity" may be sold outside

the region. *Central Lincoln Peoples' Utility District v. Johnson*, 735 F.2d 1101, 1112 (9th Cir.1984);

see 16 U.S.C. §§ 839c(f), 839f(c). "Power resources are considered 'surplus' when there is no market

or demand for them at any established rate within the region. *Southern California Edison Co.*, 770 F.

2d at 781 (citing 16 U.S.C. § 839f(c)). "The sales generally are to the Southwestern states, principally

California. The majority of power sold outside the region is 'nonfirm' energy, or energy in excess of

that which the BPA can reliably plan on producing at a critical water level." *Id.*

18.     BPA also owns a large transmission system, which it uses to deliver its power to

customers and which it also uses to transmit power sold by third parties.  Historically, and including at

the time the Northwest Power Act became law, BPA sold its federal electricity, both regionally and

outside the Pacific Northwest, on a bundled basis; that is, it combined the sale of its electricity with its

delivery service.

19.     Beginning in about the mid-1990s, FERC adopted rules requiring regulated utilities to

unbundle their sales of power at wholesale from their transmission service and to offer transmission

service under separate open access tariffs.  *New York v. FERC*, 535 U.S. 1, 10-12 (2000). Although

BPA was not subject to the rule, since 1996 it has voluntarily elected to unbundle its own transmission

and electric services and to sell its transmission services under an "open access" transmission tariff

modeled on FERC's rules.  Press Release, Bonneville Power Administration, BPA files reciprocity

tariff (April 2, 2012), *available at* https://www.bpa.gov/news/newsroom/Pages/BPA-files-reciprocity-tariff.aspx.

20.     BPA's various electricity and transmission services are provided under published rate schedules. When it proposes to change any of the rates for these services, the Northwest Power Act establishes a two-step process. First, the Act requires BPA to engage in a public process under which notice of the proposed rate changes are given to the public, and a hearing is held before a "hearing officer" appointed by the agency, who is charged with developing "a full and complete record," after which BPA's Administrator then makes a final decision. 16 U.S.C. § 839e(i). Second, before the agency may implement any rate changes it must obtain approval from FERC, which may grant interim approval pending full review of the rate filing. 16 U.S.C. § 839e(i)(6).

21.      "FERC conducts its review pursuant to substantive standards set forth in the [Northwest Power] Act. The [] Act defines two separate review standards, one for BPA's regional rates and one exclusively for BPA's rates for nonfirm energy sold outside of the region." *Southern California Edison Co. v. FERC*, 770 F. 2d at 781 (citing 16 U.S.C. §§ 839e(a)(2), 839e(k)).

22.     Utilizing these procedures, BPA held a hearing to establish rates for what it termed its "BP-16" rate period, from October 2015 through September 2017. During that proceeding, Powerex – BPA's largest customer of long-term firm transmission service on BPA's Southern Intertie – complained that its long-term firm transmission service was losing value and urged BPA to more than triple the rates for hourly service on that same Intertie as an "incentive" to force customers to use long-term firm service instead. BPA staff opposed the Powerex proposal and BPA's Administrator issued a decision that rejected the proposal in mid-2015, but eight months later the BPA staff did a complete flip-flop and proposed tripling those rates as part of the "BP-18" proceeding, for the period October 2017 through September 2019.

23.     Plaintiffs participated in BPA's BP-18 hearings and opposed the rate increase for hourly transmission service on the Southern Intertie, maintaining, among other things, (a) that BPA had failed

to meet its burden to justify that rate increase, (b) that BPA had departed, without reasoned explanation and absent substantial evidence of any material changes in circumstances from its ruling in the prior rate case, (c) that there was no evidence that BPA was at greater risk of losing long-term firm transmission sales on the Southern Intertie and (d) that, in any event, raising hourly rates so high as to make them unaffordable was not a proper means of ensuring recovery of BPA's Southern Intertie costs.

24.     In a final "Record of Decision" issued on July 26, 2017, after making several changes not relevant here, the Administrator largely adopted the position of BPA staff, including a near tripling of BPA's rates for hourly transmission service on its Southern Intertie. A few days later BPA submitted its order to FERC for its approval, but broke down its request into three companion filings: (1) to change its transmission rates on the Southern Intertie (Docket No. EF17-4-000, the filing that relates to this complaint), (2) changes to its other transmission rates (Docket No. EF17-3-000) and (3) changes to its power rates (Docket No. EF17-2-000). The transmittal letters accompanying its filings in the two transmission rate dockets state that BPA submitted these filings under sections 7(a)(2) and 7(i)(6) of the Northwest Power Act, 16 U.S.C. §§ 839e(a)(2), 839e(i)(6), and Subpart B of Part 300 of the Commission's regulations, 18 C.F.R. Part 300. Only in the filing of its power rate increases in Docket No. EF17-2-000 does BPA state that section 7(k) of the Northwest Power Act also governs. BPA also asked FERC to grant it interim authorization to implement its rate changes pending FERC's final review.

25.     Plaintiffs moved to intervene and objected, *inter alia*, to BPA's characterization of its rate change for hourly transmission service on the Southern Intertie as subject to section 7(a), rather than section 7(k) of the Northwest Power Act.

26.     Whether review is governed by section 7(a) rather than section 7(k), FERC's power is limited to determining whether the BPA filing has met the statutory standards for review; FERC cannot modify the rates, it can only accept or reject them. September 25 Order, P 11. But FERC's

standard of review of BPA's rate filings differs depending on whether they are subject to review under section 7(a) rather than section 7(k).

27.     Where review occurs under section 7(a), the standard is quite narrow. FERC has stated that under section 7(a)(2) it looks only at whether the proposed rates:

(A) are sufficient to assure repayment of the Federal investment in the Columbia River Power System over a reasonable number of years after first meeting BPA's other costs;

(B) are based upon BPA's total system costs; and

(C) insofar as transmission rates are concerned, equitably allocate the costs of the federal transmission system between Federal and non-Federal power utilizing such system.

28.     By contrast, section 7(k) "subjects non-regional rates to much broader review than regional rates." *California Energy Comm'n v. Johnson*, 767 F. 2d 631, 635 (9th Cir. 1985). Review under section 7(k) looks at whether the rates will recover BPA's costs within a reasonable period, serve to "encourage the most widespread use of Bonneville Power" and "provide the lowest possible rates to consumers consistent with sound business principles." *Bonneville Power Administration*, 80 FERC ¶ 61,118 (1997). The purpose of these additional standards is to ensure that BPA customers outside its region, particularly those in California, receive "special protection." *California Energy Comm'n*, 767 F. 2d at 635. "Finally, while section 7(a)(2) directs FERC to confirm and approve regional rates upon making certain findings, section 7(k) expressly describes FERC's responsibility to review nonregional rates for conformance with the broader rate-approval requirements of other applicable statutes." *Central Lincoln Peoples' Utility Dist.*, 735 F.2d at 1112.

29.     Even for purposes of entertaining BPA requests for interim authorization, FERC still conducts a "preliminary review" to ascertain whether the filing "appears to meet the statutory standards and the minimum threshold filing requirements of Part 300 of the Commission's regulations." September 25 Order, P 13. Thus, while it generally grants interim rate authorization, it will still look to seek whether the filing is "patently deficient." *Id*. at P 12.

30.     Where preliminary review is governed by section 7(k), FERC's regulations impose additional requirements. FERC's rules provide that it may deny BPA's request for interim rate authorization where the filing "[f]ails to comply with the applicable provisions of the Northwest Power Act or such other Acts as may be applicable." 18 CFR § 300.20(b)(1)(ii). Where the filing is reviewed under section 7(k), among the other conditions BPA must meet, it must demonstrate that its proposed rates are the "lowest possible rates to consumers consistent with sound business principles." *Bonneville Power Admin.*, 80 FERC ¶ 61,118 (1997). Part 300 of the Commission's regulations, specifically, 18 CFR § 300.14, also says that 7(k) filings must be "in compliance with § 35.13(a)(2)." That provision, in turn, deals with the requirements for "abbreviated" filings. Relevant here, an abbreviated filing must still provide a "complete cost of service analysis for the Test Period" (35.13(a)(2)(i)(B)(1)), "[a] complete derivation and explanation of all allocation factors and special assignments" (35.13(a)(2)(i)(B)(2)) and "[r]ate design calculations and narrative consistent with the information required in paragraph (h)(37)." Section 35.13(a)(2)(B)(5). Section 35.13(h)(37), in turn, requires, *inter alia*, that BPA's filing contains a "narrative statement describing and justifying the objectives of the design of the changed rate." Section 35.13(h)(37)(i). "If the purpose of the rate design is to reflect costs," the regulations add, "the utility shall state how that objective is achieved and shall accompany it with a summary cost analysis that would justify the rate design, including any discounts or surcharges based on delivery voltage or other specific considerations." *Id*. Conversely, the regulations state that "[i]f the rate design is not intended to reflect costs, whether fully distributed, marginal, incremental or other, the utility shall provide a statement to justify the departure from cost-based rates." *Id.*

31.     In their intervention and protest to FERC, Plaintiffs maintained that BPA's filing to nearly triple its rates for hourly transmission service on the Southern Intertie should have been filed under section 7(k), not section 7(a) of the Northwest Power Act. While section 7(k) refers to the rates for "non-firm electric power" sold out of the Northwest region, Plaintiffs pointed out that at the time the Act was passed, BPA's sold its non-firm electric power on a bundled basis and that these rates

explicitly included a separately stated rate for BPA transmission service. *See generally* EF17-4,

Motion of Sacramento Municipal Utility District, Transmission Agency of Northern California and

Turlock Irrigation District to Intervene, Protest and Objection to Motion for Interim Rate Approval for

BPA's Hourly Transmission Rates, Request for Evidentiary Hearing and Alternative Request for Stay

of Implementation of Hourly Transmission Rates, filed August 30, 2017 (Protest), pp. 12-14.

32.     Plaintiffs also argued that, properly reviewed under section 7(k), BPA's filing was

patently deficient and it should not be given interim authority to implement its change in rates for

hourly transmission service on the Southern Intertie. *Id.* at pp. 16-23. More specifically, Plaintiffs

maintained that BPA had not met its statutory burden to demonstrate that its rates for hourly

transmission service on the Southern Intertie were the lowest possible rates consistent with sound

business principles. On the contrary, BPA staff had acknowledged that its objective was to make the

rate so high as to be unaffordable, i.e., to "ensure that Non-Firm Service is not an economic alternative

to Long-Term Firm Service." Protest, citing BP-18-E-JP01-03, p. 42. Plaintiffs also complained that

BPA had not met the requirements under FERC's regulations to show how and why its change in rate

design departed from cost-based principles. *Id.* at pp. 17-19.

33.     FERC's September 25 Order found that review of BPA's proposed rate increase for

transmission service on the Southern Intertie was governed by section 7(a), not section 7(k). While it

briefly recounted several of Plaintiffs' arguments in support of a contrary interpretation, the September

25 Order did not discuss or analyze any of those arguments. The entirety of its ruling on this issue was

encapsulated in a single paragraph of its order:

> Contrary to the Northern California Utilities' arguments, we find that section 7(a) of the
> Northwest Power Act, and not section 7(k), governs the transmission rates at issue here and thus
> governs our review.[8]   The language of section 7(k) of the Northwest Power Act addresses power

---

[8] *See* 16 U.S.C. § 839e(k) (2012) (stating "Notwithstanding any other provision of this chapter, all rates or rate schedules for the *sale of nonfirm electric power* . . . ." (emphasis added)); 16 U.S.C. § 839a(9) (2012) (defining "[e]lectric power" within the Northwest Power Act as "electric peaking capacity, or electric energy, or both."); *Aluminum Co. of Am. v. Bonneville Power Admin.*, 903 F.2d 585, 587-89 (discussing the first nonfirm power rates that Bonneville established under section 7(k) and defining nonfirm power as "energy in excess of firm power, and is provided only when such excess exists."); *U.S. Dep't of Energy – Bonneville Power Admin.*, 53 FERC ¶ 61,193, 61,667 (1990) (stating that "nonfirm energy

rates, not transmission rates. [9] Thus, Northern California Utilities' arguments that Bonneville's filing is deficient for failing to meet the statutory standards of section 7(k) of the Northwest Power Act and the Commission's regulations promulgated pursuant to section 7(k), specifically 18 C.F.R. § 300.14 (2017) and by incorporation 18 C.F.R. § 35.13(a)(2) (2017), are irrelevant to our approval on an interim basis of Bonneville's transmission rates for the Southern Intertie. [10] The proposed rates therefore will be approved on an interim basis pending our further review. In addition, we note that interim approval allows Bonneville's rates to go into effect subject to refund with interest; the Commission may order refunds with interest if the Commission later determines in its final decision not to approve the rates. [11]

September 25 Order, P 13.

34.    Because it found that section 7(k) did not govern its review of transmission rates, FERC concluded that whether BPA's filings met the standards of that provision was "irrelevant." *Id.* at P 13.

35.    Under the provisions of the tariff in effect at the time BPA submitted its July, 2017 filing to FERC, the rates for hourly service contained no end date. BP-16-A-02-AP03, p. 21. As Section I.A. of the BPA General Rate Schedule Provisions for the rates currently in effect (Approval of Rates), further makes clear, "[a]ll rate schedules shall remain in effect *until they are replaced or expire on their own terms*." BP-16-A-02-AP03, p. 71 (emphasis added).[12]

36.    Only where BPA's tariff provisions contain an end date for the effectiveness of its existing rates would those rates expire. *Bonneville Power Administration*, 25 FERC ¶61,140 (1983) at 61,375-76. But even where that is the case, FERC has the authority, which it has exercised, to permit those rates to continue in effect beyond their expiration date. *Id.* It has exercised that authority rather than allow BPA interim authorization to charge a rate that is based on a deficient filing. *Id.* Thus,

---

is energy in excess of that which Bonneville can reliably plan on producing, based on estimates that water levels used for power generation will at times be low or critical.  That is, nonfirm energy is energy that is available to Bonneville as the result of it[ ] having water available for power generation . . . .").

[9] *See* 16 U.S.C. § 839e(k) (2012) ("Notwithstanding any other provision of this chapter, all rates or rate schedules for the *sale of nonfirm electric power* . . . ." (emphasis added)).

[10] Because section 7(k) of the Northwest Power Act does not govern our review of the rates at issue in this proceeding, section 7(k)'s allowance for a further trial-type evidentiary hearing does not provide a basis for such a trial-type evidentiary hearing here.

[11] *See* 18 C.F.R. § 300.20(c) (2017).  We further find that Northern California Utilities' arguments that our refund condition will not protect them to be speculative, and their request for the Commission to stay implementation of the rates to be unsupported.

[12] The Commission's regulations require that when BPA makes a rate filing it specify the "period during which the rates will be effective," 18.C.F.R. § 300.10(d)(4), but also specify that the rate authorization must not exceed five years. 18.C.F.R. § 300.1(b)(6). Since BPA has proposed that its rates remain in effect "until they are replaced," the cited rules, taken together, mean that, unless replaced sooner, BPA's current hourly rates may remain in effect for up to five years from the time they were authorized to go into effect.

should this court vacate FERC's interim rate authorization for BPA to charge its increased rates for hourly transmission service on the Southern Intertie, its rates in effect for hourly transmission service when BPA filed with FERC would be reinstated.

## COUNT I

**FERC'S DETERMINATION TO REVIEW BPA'S HOURLY TRANSMISSION RATES UNDER SECTION 7(A) OF THE NORTHWEST POWER ACT WAS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE NORTHWEST POWER ACT AND ADMINISTRATIVE PROCEDURE ACT**
**16 U.S.C. § 839(e), 5 U.S.C. § 706**

A. Section 7(k) unambiguously encompasses review of BPA's rates for hourly transmission service on the Southern Intertie.

37.     Plaintiffs reallege the foregoing paragraphs of this Complaint as though fully set forth herein.

38.     FERC's September 25 Order finds that review of BPA's rates for transmission service on its Southern Intertie is governed by section 7(a)(2) of the Northwest Power Act, not section 7(k), because "[t]he language of section 7(k) of the Northwest Power Act addresses power rates, not transmission rates." September 25 Order, P 13. Thus, it ruled "irrelevant" whether the filing would have been "deficient" (and thereby denied interim approval) for failing to meet the statutory standards of section 7(k) of the Northwest Power Act and the Commission's regulations promulgated pursuant to section 7(k)." *Id.*

39.     Judicial review of an agency's interpretation of the statutes it is charged with administering is governed by the familiar two-pronged test of *Chevron USA, Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984). First the court must determine whether the statute is ambiguous. If it is not, the inquiry ends and the court applies the statute's unambiguous terms. Only if the statute is ambiguous does the court consider the agency's interpretation. In such cases the court must defer to the agency's interpretation if that interpretation is a reasonable one. *Id.*

40.     FERC's orders do not state whether the agency regards section 7 of the Northwest Power Act as unambiguous. But to the extent its ruling rests on the conclusion that the Act unambiguously forecloses review of the BPA Southern Intertie transmission rates under section 7(k), its conclusion cannot be sustained. FERC cites only to the language of section 7(k) stating that it governs rates "for the sale of non-firm electric power" and to the definition of "electric power" as "electric peaking capacity, or electric energy, or both." September 25 Order, n. 23. The meaning of a statute, however, cannot be derived from examining a particular statutory provision in isolation. Its meaning "may only become apparent when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 US 120, 132-33 (2000). It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis* v. *Michigan Dept. of Treasury,* 489 U. S. 803, 809 (1989). A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 569 (1995), and "fit, if possible, all parts into an harmonious whole." *FTC* v. *Mandel Brothers, Inc.,* 359 U. S. 385, 389 (1959). Thus, to ascertain whether a statute is unambiguous, "courts must employ all 'traditional tools of statutory construction' under *Chevron* step one to ascertain whether Congress's intent is 'clear.'" *Morales-Izquierdo v. Gonzales*, 486 F. 3d 484, 500 (9th Cir. 2007). In other words, the courts will look to the text, structure, purpose, and legislative history of a statute. *Rucker v. Davis*, 237 F.3d 1113, 1119 (9th Cir.2001) (en banc); *Michigan v. EPA*, 268 F.3d 1075, 1081-82 (D.C.Cir.2001), citing *Chevron* at 842-43 and n. 9.

41.     Applying these tests, Congress's clear intent was to ensure that BPA's charges for transmission service into California – a service integral to the delivery of BPA's "non-firm electric power" into California – would be part of FERC's section 7(k) review of BPA's non-regional non-firm electric power rates. As the Ninth Circuit has stated, section (k) "subjects non-regional rates to much broader review than regional rates," *California Energy Comm'n v. Johnson*, 767 F. 2d 631, 635 (9th Cir. 1985), the purpose of which is to ensure that BPA customers outside its region, particularly those

in California, receive "special protection." *Id.* FERC's interpretation of section 7(k) would leave a

regulatory gap. An interpretation that gives effect to every clause is generally preferable to one that

does not. *Cf. Marx v. Gen. Revenue Corp.*, ___ U.S. ___, 133 S.Ct. 1166, 1177, 185 L.Ed.2d 242

(2013). In focusing on the Act's reference to "electric power," however, FERC ignores other pertinent

statutory language. Section 7(a) also obligates the Administrator to "establish, and periodically review

and revise rates for the sale and disposition of electric energy and capacity and for the transmission of

non-Federal power." 16 U.S.C. § 839e(a) (emphasis added). "Such rates [i.e., the 'rates for the sale and

disposition of electric energy and capacity and for the transmission of non-federal power'],]" the

provision adds, "shall be established and, as appropriate, revised to recover, in accordance with sound

business principles, the costs associated with the acquisition, conservation, and *transmission* of electric

power…" *Id.* (emphasis added). In other words, the statute expressly contemplates that BPA's rates for

"the sale and disposition of electric energy and capacity," including, by definition, non-firm electric

power, would recover the costs of transmission. If BPA's authority to establish rates for the sale and

disposition of energy and capacity did not include the transmission of that energy and capacity, there

would be no provision governing the transmission of *federal* power.

42.    Neither the sale nor the disposition[13] of that power can be made without use of BPA's

transmission system. There is, in fact, no dispute that at the time the Northwest Power Act was passed,

BPA's rates for the sale of "non-firm electric power" outside the BPA region expressly included its

transmission costs. BPA's early 1980s rate schedule for the sale of non-firm energy out of its region

could not have been more explicit. Its "Wholesale Nonfirm Energy Rate" expressly included a

component to reflect "the average cost of transmission."

---

[13] BPA argued before FERC that the term "disposition" did not refer to transmission, but to the transfer of federal power
from one federal agency to another. EF17-4, Request for Leave to Answer and Answer of Bonneville Power Administration
to August 30, 2017 Protest by Sacramento Municipal Utility District, et. al. under EF17-4, filed September 15, 2015, pp.
11-12. Even accepting this interpretation, both sales and dispositions of BPA non-firm energy outside the region would
necessarily encompass the transmission of that energy.

43.     Thus, when FERC previously reviewed BPA's bundled non-firm energy sales outside the region it was also expressly reviewing the embedded transmission rates for that service. BPA acknowledged this in the pleadings it filed with FERC, but maintained that it had chosen, "as a matter of rate design, to include in all of its power sales a portion of the costs of the transmission system," and now offers the services separately. EF17-4, Request for Leave to Answer and Answer of Bonneville Power Administration to August 30, 2017 Protest by Sacramento Municipal Utility District, et. al. under EF17-4, filed September 15, 2015, pp. 10-11. In enacting section 7(k), however, Congress spoke to the need for a separate review of "out of region" rates. Congress implicitly understood that the rates for BPA's out of region non-firm electric power sales must include the costs of embedded transmission service. See, e.g., *Lorillard v. Pons*, 434 US 575, 580-81 (1978). Otherwise, the statutory reference to "out of region" would have no practical application. Logically, therefore, FERC could not have lost its jurisdiction over the transmission component of BPA non-firm electric power sales simply because BPA later unbundled the generation and transmission components of those sales and now offers them separately.

44.     If the Commission did not have authority to review the rates for transmission of federal power outside the Northwest, BPA could easily circumvent the requirement that its out-of-region non-firm electric power rates be the "lowest possible rates to consumers consistent with sound business principles." In other words, BPA could raise the effective price of its non-firm electric power sold into California by simply raising the transmission charges. So long as it imposed similar higher transmission charges for the transmission of non-federal power, it would satisfy the statutory command in section 7(a)(2) that transmission costs be apportioned equitably between federal and non-federal uses of the transmission system. 16 U.S.C. §§ 839e(a)(2). But it would render empty the promise in section 7(k) that BPA would charge customers outside the Pacific Northwest the lowest possible rates for non-firm electric power consistent with sound business principles. In fact, that appears to be what happened in this case; BPA's transmission costs have declined, but it has nonetheless proposed to

nearly triple its hourly transmission rates for transmitting federal and non-federal power on the Southern Intertie.

B. Assuming section 7(k) is ambiguous, FERC's interpretation of section 7(k) is arbitrary and capricious and therefore, impermissible.

45.    If, the foregoing notwithstanding, this court determines that FERC review provisions of section 7 are ambiguous, it should nonetheless reject FERC's interpretation as unreasonable under *Chevron* step two. To constitute a permissible interpretation under *Chevron* the agency's ruling must also satisfy the arbitrary and capricious standard under the APA. *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir.2003) (en banc), *amended by* 360 F.3d 1374 (9th Cir.2004); *see also Nat. Ass'n of Regulatory Utility Commissioners v. ICC*, 41 F.3d 721, 726-27 (D.C. Cir. 1994) (recognizing that *Chevron* step two "overlaps analytically" with arbitrary and capricious review under the APA). "A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives," therefore, "is the stuff of which a 'permissible' construction is made" under *Chevron. Northpoint Technology, Ltd. v. FCC*, 412 F.3d 145, 156 (D.C. Cir. 2005).

46.    An agency acts arbitrarily (and its interpretation is then impermissible under *Chevron*) where it entirely has "failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). Thus it is the court's role "to ensure that an agency engage the arguments before it – that it conduct a process of 'reasoned decisionmaking.'" *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C.Cir. 1990).

47.    In this case, Plaintiffs pointed to the factors discussed above – (1) that at the time the Northwest Power Act became law BPA was selling its "non-firm electric power" and associated transmission service as a single bundled product,[14] and (2) that, as to "rates for the sale and disposition

---

[14] As Petitioners noted in the intervention they filed with FERC:

    Section 7(k) of the Northwest Power Act applies to "all rates or rate schedules for the sale of non-firm electric power within the United States, but outside the region." At the time the Northwest Power Act was enacted, "rates and rate schedules for the sale of nonfirm electric power" made "outside the region," i.e., outside the Bonneville region, included charges for transmission service. Indeed, these rate schedules typically included a separately identified transmission cost component. See Attachment A, p. 12, Section 2.a (specifying that the

of electric energy and capacity," the Act defines "[s]uch rates" to include, *inter alia*, "the costs associated with the …. *transmission* of electric power." 16 U.S.C. § 839e(a)(emphasis added). The September 25 Order *recounts* these arguments in its description of the positions of the parties. September 25 Order, PP 5-6. But FERC's *interpretation* of the Act, far from grappling with these arguments, arbitrarily ignores them entirely. Thus, the court cannot know, because FERC did not say, whether it disagreed with these points or, if so, why. In such circumstances the court must conclude that the agency's interpretation was arbitrary and hence impermissible.

### COUNT II
### DECLARATORY RELIEF
### 28 U.S.C. § 2201

48.     Plaintiffs reallege the foregoing paragraphs of this Complaint as though fully set forth herein.

49.     "In the case of an actual controversy… any court of the United States, upon the filing of an appropriate pleading, may declare rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201.

50.     Under the Administrative Procedure Act, a court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

51.     FERC's decision to review BPA's rates for hourly transmission service on the Southern Intertie under section 7(a) rather than section 7(k) of the Northwest Power Act was not in accordance with law.

---

wholesale rate for non-firm energy "shall be the average cost of transmission, which is 2 mills per kilowatt hour, plus" the cost of energy).

Today, these rates "for the sale of non-firm electric power" have been unbundled into rate schedules for BPA's interruptible electricity sales and rates for transmission of BPA electric power southbound on the Southern Intertie (IS-18 and FPS-18). But the Commission's review jurisdiction under section 7(k) has not changed. Non-firm energy or power cannot be sold "outside the region" without transmission service, so the Commission's jurisdiction under section 7(k) necessarily entails review of the transmission charges associated with those power sales.

Protest, p. 13.

52.     Enforcement of the September 25 Order permitting BPA to nearly triple the rates for hourly transmission service on its Southern Intertie creates a genuine, credible and immediate harm to Plaintiffs' business by raising the cost of electricity they or their Members purchase from BPA and other suppliers in the Pacific Northwest. FERC concedes that even when it grants interim rate authorization, it still conducts a "preliminary review" to ascertain whether the filing "appears to meet the statutory standards and the minimum threshold filing requirements of Part 300 of the Commission's regulations." September 25 Order, P 13. Thus, while it generally grants interim rate authorization, it will still look to seek whether the filing is "patently deficient." *Id.* at P 12. Because it did not conduct review of BPA's increase in its hourly transmission rates on the Southern Intertie under section 7(k), it did not consider Plaintiffs' claims that BPA's filing was "patently deficient" under FERC's separate regulations governing section 7(k) filings.

53.     Plaintiffs seek a declaration that FERC acted contrary to law in applying section 7(a) rather than section 7(k) to its review of BPA's increase in its rates for hourly transmission service on the Southern Intertie.

**PRAYER FOR RELIEF**

Based on the foregoing, Plaintiffs hereby respectfully request the Court grant the following relief:

a) An order declaring that FERC's September 25, 2017 order unlawfully reviewed BPA's increase in its rates for hourly transmission service on its Southern Intertie under section 7(a) of the Northwest Power Act rather than section 7(k) and that the order should be set aside insofar as it authorized BPA to implement that rate increase.

b) An order enjoining FERC to vacate that portion of its September 25, 2017 order authorizing BPA to implement the increase in its rates for hourly transmission service on its Southern Intertie and directing FERC to terminate BPA's authority to charge the increased rates for this service.

c) An order for such other relief and further relief as may be just and appropriate under the circumstances.

Dated:  November 21st, 2017                    **STINSON LEONARD STREET LLP**

By:    /s/ *Javier Torres*
Javier Torres (CA Bar No. 271538)
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiffs